GROVEDALE FEED COMPANY, INC., Plaintiff, v. CORRON, Defendant.

Municipal Court, Findlay.

No. 123.   Decided April 10, 1957.

William C. Foster, for plaintiff.
Robert D. Schuck, for defendant.

## OPINION

By BOPE, J.

This is an action for breach of a contract of sale, in which the seller claims $1942.50 with interest from July 4, 1956, as the balance

due upon the price of the goods. The buyer denies owing such sum, and counterclaims for damages in the sum of $2000.00, on a theory, as the Court understands, of breach of warranty of quality.

Plaintiff's petition alleges that on February 23, 1956, defendant "ordered" 2250 turkey poults "to be raised by plaintiff until said poults were 8 weeks old and to be delivered then to defendant." The price was to be $1.70 per poult, of which 78 cents per poult, amounting to $1755.00, was paid down. On May 10, 1956, plaintiff placed said poults in a brooder house; by July 4, 1956, they were 8 weeks old; on that date defendant "accepted" them and ordered them delivered to his farm. Delivery was made on July 5th, of 2175 birds. Plaintiff claims 92 cents per bird was due and unpaid on delivery, amounting to $2001.00, less 78 cents per bird for 75 birds not delivered, leaving a balance of $1942.50 for which plaintiff asks judgment.

Defendant's answer admits the order and, substantially, the other averments of the petition, but says the poults were to be delivered in a healthy condition and free from disease; that upon delivery they were sick and, unknown to defendant, suffering from infectious and contagious diseases; that upon discovering this, defendant attempted to reject them and tender them back, but plaintiff refused to take them back and, instead, doctored them and promised an adjustment.

Defendant's cross petition alleges additionally that 180 of these turkeys died, 900 were sickly and not marketable, defendant lost time and incurred expense in caring for the sick·flock and in preventing their diseases from spreading to other birds on his farm, all to his damage in the sum of $2000.00, for which he asks judgment.

Plaintiff's reply denies generally the allegations of the cross petition.

Trial was held November 21, 1956, before the Court without a jury. The following witnesses were sworn and examined: For the plaintiff— James Wilbur Zuercher, Treasurer, and Melvin Schroeder; for the defendant—George William Corron, Dr. George DeFrieze, and Mrs. George Corron.

The testimony was lengthy, was fully reported, and will not be set forth here, but portions of it may be referred to by the Court in developing the disposition of the case.

### FINDINGS OF FACT

The Court finds from the evidence, by a preponderance thereof, the following facts:

In 1956 plaintiff supplied to defendant approximately 6500 young turkeys aged 8 weeks, in two flocks or "hatches" of 2175 and about 4400 birds, respectively. This case concerns the first hatch.

The parties had established a course of dealing dating from March 17, 1954, when they entered into a written contract for the sale and purchase of a flock of turkeys to be completed that year. In 1955 and 1956 their agreement was by parol, that is: oral, or partly verbal and partly in writing, and some of the terms must be inferred from the conduct of the parties.

Defendant "considered" (so he testified) that the 1954 contract terms applied to the 1956 agreement, except as changed or modified. One

of these (No. 3) was: "Party of first part agrees to deliver said poults to farm of party of second part, in healthy, thrifty condition." J. W. Zuercher, plaintiff's first witness, testified that it was plaintiff's custom to deliver only healthy birds, and stated on cross examination that their agreement with defendant for 1956 "was for healthy birds, of course." This fact was established.

On February 23, 1956, defendant ordered 2250 turkeys from plaintiff, to be delivered to his farm at 8 weeks of age, at $1.70 each of which 78 cents, amounting to $1755.00, was paid down. They were to be at plaintiff's risk and expense until time of delivery, thereafter at defendant's. Plaintiff ordered the poults the same day from Zachrich Hatchery, Defiance, Ohio.

On May 10, 1956, the 2250 poults (1-day old) were received and delivered by plaintiff to the Mel Schroeder farm, R. R. 2, Columbus Grove, Ohio. Schroeder was a farmer and turkey raiser in the employ of plaintiff. He put the poults in a brooder house and cared for them the next 8 weeks, under plaintiff's direction.

During the 8 week period, the flock became sick. They were seen every week by a representative of plaintiff, and on four occasions by defendant. Some mortality is usual among young turkeys, but in this flock, according to Schroeder's record, 41 birds died the second week and 66 died the third week. This rate is unusual and excessive. Plaintiff sent 7 of these birds to an animal pathology laboratory at St. Louis for examination. They were reported suffering from "air sack," a lower respiratory disease. The flock was then treated by Schroeder, at plaintiff's direction, with auromycin for 7 days, and with sulfa quinoxalin for 5 weeks. The mortality rate dropped to normal. Because of this sickness plaintiff received a refund from the hatchery, in an amount which does not appear.

At the end of 8 weeks, defendant came to Schroeder's farm, in the evening, examined the flock and, although he appears to have had some misgivings, he instructed Schroeder to deliver the flock to him the next day, which was done.

On July 5th, shortly after the delivery, defendant observed sulfur-colored droppings, indicating disease. He called Dr. George DeFrieze, a veterinarian, who came and examined the flock. His findings indicated that many of these birds had been infected with "blackhead," an intestinal disease caused by protozoa which can be fatal in 4 weeks, the birds having had it for from 10 to 21 days. Dr. DeFrieze prescribed dosages of a medicine called "heptrol," which was administered by the defendant, and the doctor saw the flock every 2 weeks thereafter until they were sold. The blackhead would clear up and re-occur. It stunted the growth of some turkeys but not all. This flock also developed sinusitis, unrelated to the blackhead.

On July 10th and 24th defendant, tendered the flock back to the plaintiff and plaintiff refused to take them. Defendant kept the flock, treating and feeding them, and sold them at 27 weeks of age. Normal age at which turkeys are sold to the trade is 24 weeks.

As to financial loss resulting from the diseased condition of this

flock, defendant testified that he calculated his losses at a total of $3242.78, which he itemized as follows:

| | |
|---|---|
| Cost of medicines and medicated feed supplements, | $1233.42 |
| Mortality in excess of normal 2%, 230 birds @ $2, | 460.00 |
| Disinfecting implements, labor and material (est.) | 300.00 |
| Extra feed for 3 weeks (estimated) | 350.00 |
| Loss due to down-grading: | |
| 134 head graded B instead of A, averaged | 152.96 |
| 1767 head of sub-standard weight, averaged | 746.40 |

On cross examination defendant reduced the number of birds sold as grade B to 68, but maintained that the other figures were correct.

## CONCLUSIONS OF LAW

The problems presented by this case arise in that specialized branch of the Law of Contracts known as the Law of Sales. This is closely regulated by statute, as Ohio has had the Uniform Sales Law since January 1, 1909. In the Revised Code it is found in §§1315.01 to 1315.76, inclusive. These sections are generally clear, but in some there is room for interpretation, and as the law is applied to the facts of this case there arises at least one question of mixed fact and law which can be decided either way on the basis of support to be found in Ohio cases. This will be noted in the course of this discussion.

We have here a divisible contract to sell future goods (turkeys), which became a sale when title passed. For definitions of terms used see §1315.01 R. C.; 35 O. Jur. 663, Sec. 3. The contract consisted of the whole understanding and agreement of the parties, which was in parol and much of which must be inferred from their acts and conduct. Sec. 1315.04 R. C. The Court finds that their conduct conformed to all of the terms and provisions of the written contract of March 17, 1954, except those prescribing the number of birds, the dates, and the price, hence concludes that the other terms were included in the agreement for 1956.

One of these terms (No. 3) was that plaintiff would deliver the birds in healthy, thrifty condition. The Court has already found as facts that the number delivered was 2175, the date: July 5, 1956, and the price: $1.70 each, of which 78 cents apiece had been paid for 2250 birds. The Court has also found as a fact that many of these birds were sick on delivery. Whether the plaintiff knew that they were sick is immaterial, and it is not necessary for the Court to make a finding on that point, for reasons that will appear.

Title and property interest in these birds passed from plaintiff to defendant at the time of delivery to defendant's farm. The reason for this conclusion is that such was the intention of the parties, as deduced by the Court from the terms of the contract, conduct of the parties, usages of trade, and the fact that the seller was required by the contract to deliver the birds to the buyer at his farm. Secs. 1315.19 and 1315.20 (E) R. C.

Risk of ordinary loss also passed from seller to buyer at time of delivery The reason, again, is that in this case the parties so intended; but the general rule is the same, in the absence of agreement. Sec. 1315.23 R. C.

Having received the birds, the law requires the buyer to accept and pay for them. **Sec. 1315.42 R. C.** He is entitled to a reasonable opportunity of inspecting them. **Sec. 1315.48 R. C.** And he is deemed to have accepted them when, after delivery, he does any act in relation to them which is inconsistent with ownership of the seller, or when, after a reasonable time, he retains the goods without rejecting them. **Sec. 1315.49 R. C.** There is no doubt that, in this case, the defendant accepted the goods.

But acceptance by the buyer does not discharge the seller from liability in damages for breach of a promise or warranty in the contract to sell. **Sec. 1315.50 R. C.** So it becomes important to inquire whether the provision numbered 3 in the contract of March 17, 1954, which the Court has found was included in the agreement for 1956, constituted a warranty surviving acceptance. The plaintiff argued vigorously that it did not, that the words used were mere words of description; that the defendant had inspected the turkeys prior to delivery and accepted them in reliance on his own judgment, not on representations of the plaintiff; that no fraud was shown, there being no evidence that the plaintiff knew the birds were sick upon delivery; that if the birds were of inferior quality the buyer was not bound to accept them, but since he did accept them, he is deemed to have assented that they corresponded to the description and is precluded from subsequently questioning it. The Court thinks otherwise.

This is the heart of the case. This is the question which could possibly be decided either way. On due consideration this Court is of the opinion and therefore finds that Provision No. 3, mentioned above, which is referred to in the introductory paragraph of the old contract as a "condition," amounted to a promise on the part of the plaintiff that the turkeys would be in healthy, thrifty condition. It was in express terms. It was part of the consideration for the price. It was an affirmation whose natural tendency was to induce the buyer to purchase, and the Court believes and finds that the buyer purchased the turkeys relying thereon. It was therefore an express warranty. See §§1315.12 and **1315.13 R. C.** And failure to perform this promise was a legal wrong. **13 O. Jur. 65.**

There is also evidence in this case from which the Court could find that the seller knew the buyer wanted these turkeys to feed and fatten for resale in the ordinary course of trade, and that the buyer relied to a large extent on the seller's judgment. These facts would raise an implied warranty under §1315.16 R. C.

Where a warranty exists, it is the law that acceptance of the goods by the buyer does not discharge the seller from liability in damages for a breach thereof. unless the agreement of the parties expressly or by implication so provides. **Sec. 1315.50 R. C.; 35 O. Jur. 858.** There was nothing to that effect in the agreement in this case.

Hence. while the unpaid seller may maintain an action for the price (§1315.64 R. C.), the buyer may keep the goods and set up against the seller the breach of warranty, by way of recoupment or diminution of the price, or as a separate cause of action on the contract. **Sec.**

**1315.70 R. C.** In this case the buyer has set up his cause of action as a counterclaim for damages.

The only question remaining to be decided is the amount of defendant's damages. There is no claim for punitive damages. Compensation only is sought, but defendant has attempted to prove some special damages.

Actual or compensatory damages are either general or special. General damages are those which naturally and necessarily result from a wrongful act or omission, which are directly traceable to, and the probable and necessary result of, the injury. **13 O. Jur. 69.** The Sales Act states the rule thus in **§1315.70 R. C.:**

"The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events from the breach of warranty."

And further restricts damages thus:

"In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty."

In this case defendant offered no evidence of the value of the poults at the time of delivery, other than the contract price.

Special damages are such damages as do not necessarily result from the injury complained of, though they may be the natural result thereof. **13 O. Jur. 69.** Now in this case defendant in his cross petition specifically claims that about 180 birds died, 900 were so sick that they would not develop into marketable birds, defendant lost time and suffered expense in buying and administering medicine, and in preventing their disease from spreading to other birds on his farm, all to his damage in the sum of $2000.00. He cannot recover more than the amount claimed in his cross petition. **13 O. Jur. 71.** Further, only such special damages can be allowed as are shown by a preponderance of the evidence to have resulted naturally and proximately from the injury (**§1315.70 R. C.**), or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of a breach of it (**35 O. Jur. 987, 988**).

The Court finds by a preponderance of the evidence that the following items of special damage to the defendant resulted naturally and proximately from the breach of plaintiff's warranty, or may be reasonably supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of a breach of it:

| | |
|---|---:|
| Cost of medicines and medicated fee supplement, | $1233.42 |
| Mortality in excess of normal, 180 birds at $2, | 360.00 |
| Labor and material cost, disinfecting implements, | 200.00 |
| Extra feed for 3 weeks, | 300.00 |
| Total | $2093.42 |

The total damage will be reduced to $2000.00, the amount claimed in the cross petition.

### CONCLUSION

For the reasons given above, finding and judgment will be awarded the plaintiff on its petition, and against the defendant, for the balance due upon the contract, in the sum of $1942.50 with interest at 6% per annum from July 4, 1956, and costs.

Finding and judgment will be awarded the defendant on his cross petition, and against the plaintiff, for damages for breach of warranty in the sum of $2000.00 and costs made on the cross petition.

An Entry may be prepared so recording the action of the Court, saving exceptions to both parties.